**CASE NO. 20-4390**

# IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

CHIKOSI LEGINS,

*Defendant-Appellant.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT RICHMOND

———————————

## OPENING BRIEF OF APPELLANT

———————————

Charles A. Gavin
CAWTHORN, DESKEVICH & GAVIN, P.C.
1409 Eastridge Road
Richmond, VA 23229
804-288-7999
c.gavin@cawthorn.net

*Counsel for Appellant*

# TABLE OF CONTENTS

<u>**Page No.**</u>

Table of Authorities Cited ...................................................................... ii

Statement of Subject Matter Jurisdiction and Basis for
   Appellate Jurisdiction ............................................................1

Issues Presented for Review ...................................................................1

> **I.    The evidence was insufficient to support the conviction under 18 U.S.C. 1001.**
> **II.   The defendant was improperly subjected to an enhanced penalty of eight years.**
> **III.  The trial court erred in the sentencing of the defendant, both procedurally and substantively.**

Statement of the Case..............................................................................1

Statement of Facts....................................................................................5

Summary of Arguments............................................................................12

Argument...................................................................................................12

Conclusion ...............................................................................................37

Statement Regarding Oral Argument .....................................................38

Certificate of Compliance .......................................................................39

Certificate of Service ..............................................................................40

i

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page No.**

Alleyne v. United States, 570 U.S. 99 (2013) ........................................21

Apprendi v. New Jersey, 530 U.S. 466 (2000) ...............................3, 21, 22

Blakely v. Washington, 542 U.S. 296 (2004)...........................................35

Cunningham v. California, 549 U.S. 270 (2007) ....................................35

Molina-Martinez v. United States, 136 S. Ct. 1338 (2016) ............... 23-24

Rosales-Mireles v. United States, 138 S. Ct. 1897 (2018) .....................24

Stirone v. United States, 361 U.S. 212, (1960) .....................................13

United States v. Barber, 119. F.3d 276 (4th Cir. 1997) .........................30

United States v. Diaz-Ibarra, 522 F.3d 343 (4th Cir. 2008) ..................23

United States v. Hoover, 467, F.3d 496 (5th Cir. 2006) .........................13

United States v. Legree, 205 F.3d 724 (4th Cir. 2000) ..........................19

United States v. Ritchie, 858 F.3d 201 (4th Cir. 2017) ..........................13

United States v. Romen, 148 F.3d 359 (4th Cir. 1998) ..........................12

United States v. Smith, 29 F.3d 914 (4th Cir.), *cert. denied*,
    115 S. Ct. 454, 130 L. Ed. 2d 363 (1994) .......................................12

**Statutes**

18 U.S.C. §242 .......................................................................................1
18 U.S.C. §1001 ............................................. 1, 12, 13, 19, 20, 21, 22, 35
18 U.S.C. §1001(a)(2).........................................................................20
18 U.S.C. §1001(3)............................................................................. 19
18 U.S.C. §2243(b)............................................................................2,3
18 U.S.C. §2244................................................................................24, 28
18 U.S.C. §2244(a)(4)..........................................................................3
18 U.S.C. §3553(a) ......................................................................... 23, 36
28 U.S.C. §1291...................................................................................1

## **Other Authorities**

U.S.S.G. §2A3.4.................................................................................36

U.S.S.G. §2J1.2 ...............................................................3, 4, 28, 30, 31

U.S.S.G. §2J2.1(b)(1)(A) ...............................................................22

U.S.S.G. §2X3.1 .................................................................31

U.S.S.G. §5H1.5................................................................................34

U.S.S.G. §5K2.7.................................................................................31

## STATEMENT OF JURISDICTION

This is a criminal matter with an automatic right of appeal pursuant to 28 U.S.C. 1291.   Appellant timely filed his notice of appeal within the time period prescribed by the Federal Rules of Appellate Procedure.   J.A. 1065.1.   This appeal is from a final order that disposed of all claims with respect to the parties.

## ISSUES PRESENTED FOR REVIEW

   I.    **The evidence was insufficient to support the conviction under 18 U.S.C. 1001.**

   II.    **The defendant was improperly subjected to an enhanced penalty of eight years.**

   III.   **The trial court erred in the sentencing of the defendant, both procedurally and substantively.**

## STATEMENT OF THE CASE

On July 24, 2019, a grand jury returned an indictment against defendant Chikosi Legins, charging him with five offenses.   J.A. 25   Specifically, in Count One, the Indictment charged Mr. Legins with depriving the alleged victim, B.L., "of the right, secured and protected by the Constitution of the United States, not to be subjected to cruel and unusual punishment" while acting under color of law in violation of 18 U.S.C. §242, and by subjecting B.L. to aggravated sexual abuse. Count Two charged Mr. Legins with aggravated sexual abuse and attempted

1

aggravated sexual abuse, alleging that Mr. Legins used force and attempted to use

force against B.L. to penetrate B.L.'s mouth and anus with his penis.   In Counts

Three and Four, the Indictment charged Mr. Legins with sexual abusse of  a ward

in violation of 18 U.S.C. Section 2243(b) for two separate incidents involving Mr.

Legins and B.L. namely: (1) a May 10, 2018 incident in which Mr. Legins

allegedly penetrated B.L.'s mouth and anus and, (2) a March 16, 2018 incident in

which Mr. Legins allegedly penetrated B.L.'s mouth.   Finally, Count Five charged

Mr. Legins with making two materially false, fictitious or fraudulent statements to

FBI and OIG investigators in the investigation of these alleged crimes, specifically:

(1) falsely denying that Legins engaged in a sexual act with any inmate at any time

at FCI Petersburg; and, (2) falsely stating that on May 10, 2018, Legins attempted

to use a computer and printer in an administrative office while engaged in "just

conversation" with B.L. when Legins was, in reality, engaged in a sexual act with

B.L.

    After considering the evidence presented during trial and the court's final

instructions, the jury returned a verdict of not guilty on Counts One, Two, Three

and Four, and a verdict of guilty solely on Count Five.   J.A. 818.   In finding Mr.

Legins guilty on Count Five, the jury checked the lines to indicate that the

government proved the falsity of both statements.   J.A. 818 at 820.   Based on the

jury's verdict, the court found Legins guilty on Count Five and scheduled the

matter for sentencing.   Legins filed a Motion to Set Aside Verdict which was denied.   J.A. 823.

After trial, the court, <u>sua sponte</u>, reviewed the transcript of the arraignment and confirmed the court's internal records which indicated that the government, during Legin's arraignment, stated on the record that the maximum punishment for the offense was five years.   After briefing, the court, over defense objection, directed the Probation Officer to calculate the initial PSR based on an eight-year maximum term under U.S.S.G § 2J1.2, concluding that <u>Apprendi .v. New Jersey</u>, 530 U.S. 466 (2000) was inapplicable, and that government's incorrect recitation of the maximum sentence on the record during arraignment was harmless.

The court then found that the government had proven by a preponderance of the evidence that Legins had committed two offenses, namely: (1) abusive sexual <u>contact</u> with B.L. in violation of 18 U.S.C. § 2244(a)(4) on March 16, 2018 (an incident not charged in the indictment), and (2) sexual abuse of a ward in violation of 18 U.S.C. § 2243(b) on May 10, 2018 (conduct specifically acquitted by the jury under Count Three).   J.A. 920-927.

The court instructed the probation officer to calculate the initial sentencing range based on its conclusion that the underlying offense for purposes of the cross-reference was the acquitted conduct under Count Three, which alleged that Legins sexually abused B.L on May 10, 2018.   <u>Id.</u>   The court then ordered the probation

3

officer to group the uncharged conduct (abusive contact from March 16, 2018) as
if it had been charged and proven.   J.A. 924.   The court further required the
parties to file briefs on their respective positions which were filed.   See J.A. 934;
957.   After grouping, the probation officer determined that the calculation under §
2J1.2 yielded an offense level of 18 (14+4), which was greater than the result
under the cross reference.   J.A. 1082.   Accordingly, the court calculated the
guideline range under §2J1.2.   That guideline range was 27 to 33 months of
imprisonment.   J.A. 966.

At the final sentencing hearing, the court denied Legins' request for a
downward variance, and instead granted the government's motion for an upward
variance.   The court issued a Memorandum Opinion including its conclusions on
sentencing.   J.A 1035.   The court, to account for its findings that Legins had
sexual contact with B.L. on March 16, 2018, and because the grouping rules in the
guidelines, in its view, resulted in a sentencing guideline range that did not
adequately address uncharged conduct, created an offense level for that uncharged
conduct as if it had been charged and proven separately (15-21 months).   J.A. 993-
994.   The court then added that created range to the previously-calculated
guideline range of 27 to 33 months, resulting in a new range of 42 to 54 months,
based on a five-level upward departure.   J.A. 995.

The court then sentenced Mr. Legins to the top end of that arbitrary range

4

based on other "related conduct," most of which was not in the nature or

obstruction, and not authorized by the jury's verdict. J.A. 1003-1033.   The district

court sentenced Mr. Legins to serve 54 months in prison.   Legins timely appealed.

J.A. 1065.1.

## STATEMENT OF FACTS

The government alleged that Chikosi Legins, a guard at Petersburg FCI,

Medium Security Facility, sexually abused B.L. on two separate occasions.   J.A.

25.   The first alleged offense date per B.L. was March 16, 2018.   J.A. 227-232.

The location of the alleged offense was in an elevator that ran between the first

floor (Echo Unit) and the second floor (Fox Unit).   The elevator was in a corridor

that connected the Fox South to the Fox North Unit.   J.A. 817.2; 817.3;   817.4;

817.5; 817.6; 817.7; 817.8; 817.9.   This corridor was not open to inmate travel,

and was locked on both ends. J.A. 817,3; J.A. 103-106. There was no camera

surveillance in the corridor.   J.A. 181. The officers and staff members were the

only individuals that had access to the corridor.   Also in the corridor, but separate

from the corridor, there was an administrative office (the "office") controlled by its

own locked door.   J.A. 129-130; J.A. 817,4.   In the office, there was a bathroom

for officers and staff.     J.A. 817.9:   Id.   The office also included a computer and

copier utilized by staff and officers.   J.A. 129-130; J.A. 817.6.   The elevator door

was in the corridor. See, J.A. 227-228.        B.L. had a work assignment at the

facility delivering posters detailing facility activities to the various units.   J.A.

221-223.   Accordingly, B.L. would walk from one unit to another, floor to floor,

putting up posters.   Id.   To help B.L., as a matter of convenience and efficiency,

Legins and/or other officers, would escort B.L. through the corridor from the Fox

South Unit to the Fox North Unit.   Id. The corridor was approximately 49 feet

long.   J.A. 692.   Cameras from the main pods recorded entry into the corridor

from the Fox South side and the exit from the corridor on the Fox North side.

   According to B.L., on March 16, 2018, Legins trapped B.L. in the corridor

elevator, forced B.L. to engage in oral sex in a violent manner, and ejaculated

everywhere, including on a sweatshirt B.L. was wearing.   J.A. 226-232.   B.L. did

not report the incident, but allegedly retained the sweatshirt.   J.A. 240-241; J.A.

323-334.

   The second alleged offense date per B.L. was May 10, 2018.   J.A. 247-257.

B.L. alleged that, while being escorted between Fox South and Fox North through

the same corridor on May 10, 2018, Legins took B.L. into the office and forced

him to perform oral sex for a period of time, then pushed B.L. to the back of the

office where Legins allegedly raped B.L.   Id.   J.A. 817.6- 817.7.   The time

stamps on May 10, 2018 from the main common area cameras reflect entrance by

Legins and B.L.   into the Fox South corridor at 18:10:09.   J.A. 129.   Legins and

B.L. exit on the Fox North side at 18:15:24.    J.A. 133.   The total elapsed time

6

totaled 350+/- seconds.   A timeline introduced by defense investigator indicated

that the mere opening and closing of doors as alleged by B.L., and the regular

walking time from location to location as described by B.L. would have required

70 seconds of the total 315.   Accordingly, B.L's version was that B.L. and Legins

entered the corridor, entered the locked office where B.L. was forced to perform

oral sex on Legins for a period of time, then pushed to the back of the office by

Legins, undressed, then raped   until Legins ejaculated, after which Legins went to

the bathroom, and washed his hands, after which B.L. cleaned up, after which they

both exited   back out the locked office door into the corridor, and exited on the

Fox North side, and all inside of 315 seconds.   B.L. executed an Affidavit, under

oath, as to his version of both events, on May 10, 2018.   J.A. 817.10.   B.L.'s

statement under oath was the he was raped for five minutes.   J.A. 817.10

B.L. was transported to St. Mary's Hospital where he underwent a rape kit

examination.   J.A. 35; 39. The forensic rape kit at St. Mary's revealed no physical

damage or injury to B.L.   J.A. 51.   No breaks in the skin.    J.A. 51.    No fibers

or fluids.   J. A. 51.   The forensic nurse tested B.L.'s anus using a toluiene dye test

under a microscope which would have detected the slightest tear of any skin cell.

J.A. 51.   No cell damage was detected.    J.A. 51.   The expert could not

objectively identify any pain being suffered by B.L. based on her examination.

J.A. 67.   B.L.'s forensic examination was, based on the government's expert, a

7

normal exam.    J.A. 49.

The government's expert (Womble) was also the same forensic nurse that conducted the rape kit examination at St Mary's hospital on May 10.   When questioned about possible explanations for the lack of damage or injury, the expert testified that several factors would have been in play.   J.A. 52.   Lubrication, duration of event, and force.   J.A. 52.   Sphincter tone was also factor.     J.A. 53. On cross-examination, the government's expert agreed, however, that B.L's anus had good muscle tone (tight).   J.A. 68.   While saliva was the alleged lubricant used by Legins, the expert agreed that saliva was just a lubricant because it was wet.   J.A. 64.   Saliva had no innate lubrication feature.   J. A. 64.   The parties stipulated that Legins' penis at full erection was seven inches.   J.A. 33.1-33.4.

The government's expert was then asked about the presence of internal injury.    J.A. 54-55.   Per Womble "If injuries are inside, I can't see them from the outside."   J. A. 55.   Womble testified that an anoscope could have been used to check for internal injury if she believed it was necessary.    J.A. 55.    Womble added, however, that based on the lack of damage to the exterior, there was no basis to escalate the examination to an internal examination.   J.A. 55.

Oddly, however, the examination did, however, reflect a piece of suspected toilet tissue around the circumference of B.L.'s rectum.   J.A. 70.    This paper product was never explained by B.L. or the government, despite B.L's statement

8

that B.L. did not have a bowel movement , or take any measures to clean himself

between the alleged incident and the forensic exam.    J.A. 66.    The forensic expert

called by Legins (Cheek), essentially, corroborated the government's expert in

opining that B.L.'s examination revealed no evidence no injury or damage.    Cheek

further opined that, based on the analysis of the factors including penis size, force,

duration, the affidavit from B.L., and lubrication, if the event happened as alleged,

she would have expected to see injury. J. A. 712.    Cheek then further elaborated

on the toilet paper discovered during the examination which extended around the

circumference of B.L.'s anus.    Specifically, in her opinion, there would be no

reason for toilet paper to exist in B.L's rectum if the victim has just been raped for

five minutes using only saliva.    J.A. 712.

In reviewing the FBI's forensic evidence, the government did not introduce

any DNA attributable to Legins from the office.    The evidence from the elevator

was not tested.    J.A. 452    There was DNA found on the sweatshirt allegedly

retained by B.L. after the March 16 unreported incident, but the DNA could not be

confirmed as semen.    J.A. 445.    A jock strap B.L. was wearing when he reported

the incident on May 10, 2018 contained DNA likely related to Legins.    J.A. 418-

420; J.A. 817.1.    The DNA on the jock strap could not be confirmed as semen.

J.A. 418.    Coincidentally, a piece of a paper product was collected from B.L. on

May 10, 2018, along with the jock strap, lip balm and shorts.    All four items were

included in the same evidence bag, but the paper was not tested.   J.A. 450-451;

J.A. 423-424; J.A. 817.1.   An anorectal swab taken as part of the rape kit included

DNA likely related to Legins.   J.A. 408-410.   The exact collection location of the

swab was not, however, identified by either government expert.   As conceded by

the government's DNA expert, none of the findings were conclusive that the

samples were semen.   JA. 407.   The government's expert could not opine on

how the DNA got there, just that it was there.   J.A. 424.   The government's

expert agreed that DNA can be transferred by touch alone.   J.A. 451.   Swabs of

the thighs, buttocks, lips, mouth or genitalia did not reveal any DNA attributable to

Legins. J.A. 432-436.

On June 5, 2018, Legins was interviewed by Special Agent Johnny Lavendar

and OIG Officer Stephen Orloff.   During the interview, Agent Lavendar asked

Legins if he had sexual activity, whether by force or consensually, with any

inmates while at FCI Petersburg.   J.A. 488-499.     Legins stated that he had not.

When questioned about the May 10, 2018 incident, Legins relayed to the officers

that the time span between entry into the corridor between the Fox South door and

the exit on the Fox North side was caused by the fact that Legins wanted to print

additional "cop out" forms.   J.A 491-496.   These were standard forms used in the

unit.   Legins said that he tried to insert his staff computer card, which authorized

access, into the printer.   Id.   Legins then stated that, when he tried to punch in his

authorization code, the computer would not accept the code because Legins was

using the number keys at the top of the keypad.  Id.  According to Legins, he

eventually discovered that the computer number lock had been activated by a

former user forcing the user to use the number pad on the right side of the keypad,

as opposed to the number keys at the top.  According to Legins, by the time he

deciphered the problem, Legins realized that he had spent too much time so he

exited the office, abandoned his attempt to get the copies, and escorted B.L. to the

Fox North exit door. Id.

Upon completion of the investigation, the United States charged the

defendant as outlined herein.  The basis for Count Five were the two statements in

which (1) Legins denied that he had engaged in sexual activity with any inmate at

the facility, and (2) Legins stated that he and B.L. entered the corridor

administrative office to print off copies when, in fact, he entered the office with the

intent of sexually abusing B.L.

During trial, the defense offered the testimony of two witnesses who

provided voluntary statements as part of the government's investigation.  Richard

Fornash testified that he heard B.L., during a casual group conversation, heard B.

L. state that he would use sex with an officer as a way to gain something in return.

J.A. 657.  Ajibola Erogbogbo, an inmate librarian, testified that he, at B.L's

request, assisted B.L. in researching claims on Lexis which involved claims against

11

officers for monetary gain.   J.A. 667-670.

## SUMMARY OF ARGUMENTS

**I.**     **The evidence was insufficient to support the conviction under 18 U.S.C. § 1001.**

**II.**    **The defendant was improperly subjected to an enhanced statutory maximum sentence of eight years.**

**III.**   **The trial court erred in the sentencing of the defendant, both procedurally and substantively.**

## ARGUMENT

I.  **Evidence insufficient**

A.  STANDARD OF REVIEW

The conviction must be sustained if the evidence, when viewed in the light most favorable to the Government, is sufficient for any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt.   United States v. Romen, 148 F.3d 359, 364 (4th Cir. 1998).   The evidence must be substantial. Substanital evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt. See United States v. Smith, 29 F.3d 914, 917 (4th Cir.), *cert. denied*, 115 S. Ct. 454, 130 L. Ed. 2d 363 (1994).

B.   DISCUSSION OF ISSUES

The government charged Legins with making two false statements in violation of 18 U.S.C. § 1001, when he allegedly lied about the commission of sexual acts, and using a false alibi to cover up his commission of a sexual act on May 10, 2018.   The elements of a § 1001 violation are falsity, materiality, knowingly and willfully made, and within federal jurisdiction.   United States v. Ritchie, 858 F.3d 201 (4th Cir. 2017).   Mr. Legins stipulated the element of jurisdiction. The government was required to prove each element beyond a reasonable doubt.

The fundamental premise of Count Five was that the sexual acts occurred. Without substantiated evidence that they did occur, the government has not met its burden to prove falsity.   More specifically, when the government chose to specifically charge the manner in which the defendant's statement was false, the government must have proved that it was untruthful for that reason.   Stirone v. United States, 361 U.S. 212, (1960); United States v. Hoover, 467, F.3d 496 (5th Cir. 2006).   In this case the Indictment specifically alleged that the false statements were about a sexual act with any inmate at FCI Petersburg.   J. A. 25 at 28.   The second statement by Legins about the events in the office was also premised on the occurrence of the sexual act within the office.   J.A. 28.   In fact, Special Agent Lavender considered sexual acts as the basis for the false statements.

13

J.A.  528-531.   That being the case, the question is whether there was substantial credible evidence to support the underlying premise beyond a reasonable doubt. That proof must have included anal and oral penetration.   If not, a reasonable finder of fact could not have convicted the defendant of making false statements about an event that was not proven.

The underlying acquittals on Counts One through Four have to be incorporated into this argument insofar as the jury convicted Legins of lying about the commission of a "sexual act" for both offense dates, but the jury acquitted Legins in Counts One through Four of engaging in a sexual act whether by force, or by consent, on either offense date.   In other words, in Counts One through Four, the jury actually resolved all contradictions in the evidence in favor of the defendant, not the government, and thus rendered B.L's allegations unbelievable.

Essentially, all of the government's evidence relied on 1) direct evidence in the form of B.L's testimony, 2) the circumstantial forensic evidence collected from a sweatshirt allegedly owned by B.L, a jock strap worn by B.L. on May 10, 2018, and a swab from the B.L.'s rectum on May 10, 2018, and 3) the forensic evidence collected from the rape exam.   These items were all collected from B.L., based solely on B.L.'s allegations of how Legins' DNA may have made it to each item or location.

With respect to B.L.'s direct testimony, the two conclusions of falsity were

14

necessarily based on B.L's version of events. There were no other eyewitnesses.
The DNA evidence recovered from the elevator on March 18, 2018 was not tested.
J.A. 452.    There there was no DNA evidence introduced from the administrative
office for the May 10, 2018 offense date.    There was no camera or other video
evidence produced from within the office.

With respect to the May 10, 2018 incident, the time stamps on the video
reflected entrance into the corridor at 18:10:09.    J.A. 129.    Exit on the Fox North
side at 18:15:24.    J.A. 133. The total elapsed time was 315 +/-seconds.    A
timeline introduced by defense investigator indicated that the mere opening and
closing of doors, and walking to exit location, as alleged by B.L. would have
required 70 seconds of the total 315.    B.L. alleged that he was forced to perform
oral sex on Legins for a period of time just beyond the door(J.A. 817..5), was then
pushed to the back of the room by Legins, undressed, then raped for five minutes
(J.A. 817.7) until Legins ejaculated, after which Legins went to the bathroom (J.A.
817.9), and washed his hands while B.L. got dressed, after which they both exited
back out the locked office door (J.A. 817.5) into the corridor, and exited on the Fox
North side (J.A. 817.3), and all inside of 315 seconds.    The jury unequivocally
rejected B.L.'s version.    In addition to the rejection by the jury of that testimony,
there was the testimony of Richard Fornash for the defense, who testified that B.L.
had stated around the softball field that B.L. would use sex with an officer as a way

15

to take advantage for other means.    J.A. 157.    Another defense witness, Erigbobo,

a librarian, testified that B.L. recruited his help to conduct online Lexis research to

find out about fraud and claims against officers for monetary gain.    J. A. 667-669.

The net result of B.L's direct testimony, based on the jury's verdict on Counts One

through Four was that it failed to support any allegation of sexual abuse.    That

finding would logically extend to a determination that there was no sexual act as

alleged in Counts One through Four.

In turning to the forensic evidence discovered through the rape kit at St.

Mary's, the exam revealed no physical damage or injury to B.L at all.    J.A. 51.

No breaks in the skin.    J.A. 51.    No fibers or fluids.    J. A. 51.    Not the slightest

tear of any skin cell using toluiene dye and microscope. J.A. 51.    It was, based on

the government's expert, a normal exam.    J.A. 49.    B.L's anus had good

muscle tone (tight).    J.A. 68.    The parties stipulated that Legins' penis at full

erections was seven inches.    J.A.33.1-33.4.    Spit was not really a lubricant.    J.A.

64.

The defendant's affidavit provided at the time of the incident, and as part of

the "prompt reporting" argument which was relied upon by the government to

corroborate B.L's truthfulness, stated the rape lasted five minutes. J. A. 817.10.

The government' expert, however, who was also the forensic nurse who conducted

the exam, did not discover objective

16

symptoms that would have justified a conclusion of pain based on her examination. J.A. 67.

No internal exam was attempted based on the fact that there was no basis to escalate the examination to an internal examination. J.A. 55. Per Womble "If injuries are inside, I can't see them from the outside." J. A. 55. In sum, the government's circumstantial evidence through the rape kit, in a light most favorable to the government, failed to prove that there was any penetration of B.L's anus or mouth, at all.

Contrarily, the government's circumstantial evidence tended to establish that B.L. was the individual providing false statements. Specifically, the rape kit examination reflected a piece of toilet tissue around the circumference of B.L.'s rectum. J.A. 70. This paper product was never explained by B.L., or the government, despite B.L.'s statement that B.L. did not have a bowel movement, or take any measures to clean himself between the alleged incident and the forensic exam. J.A. 66. As opined by defense expert, and as common sense would require, it would have been virtually impossible for B.L. to have been raped by a man with a seven-inch penis for five minutes, using saliva, without injury and there still be toilet paper in the victim's anus. While admittedly, there was an anorectal swab taken as part of the rape kit which included DNA likely related to Legins. The exact collection location of the swab was not, however, identified by either

17

government expert.    As conceded by the government's DNA expert, none of the

findings were conclusive that the samples were semen.    JA. 407.    Just DNA.

The government's expert could not opine on how the DNA got there, just that it

was there.   J.A. 424.    DNA can be transferred by touch alone.    J.A. 451.

Lastly, with regard to the evidence from FCI Petersburg, there was DNA

found on the sweatshirt allegedly retained by B.L. after the March 16 unreported

incident.    The origin of the DNA, whether sweat, or skin, or other medium, was

not scientifically established.    B.L.'s version was rejected.    The mere presence of

DNA did not establish penetration or either B.L.'s mouth or anus.    A jock strap

B.L. was wearing when he reported the incident on May 10, 2018 contained DNA

likely related to Legins.    The original of the DNA was not scientifically

established.    B.L's version was rejected.    The presence of DNA did not establish

penetration.    Coincidentally, a piece of a paper product was collected from B.L.

along with the jock strap.    Both items were included, along with some lip balm,

included in the same evidence bag.    J.A. 450.    The paper was not tested.    J.A.

450.    Transfer could have occurred within the bag.    J.A. 450-451.    Arguably, this

paper could have been used by B.L. to transfer Legins' DNA to his own rectum

area in an attempt to falsely claim rape, or to the sweatshirt.

In sum, although there was evidence to establish that Legins' DNA was in

the area of B.L's anus, there was no basis to conclude it was semen, or that it was

18

there as a result of sexual abuse, or, more importantly, that   penetration occurred. In the absence other evidence to establish actual penetration, there was no substantial evidence to establish that Legins' statements in the June 5, 2018 interview were false statements in violation of 18 U.S.C. §1001, and the conviction should be vacated.   The evidence was insufficient as a matter of law.

**II.     The trial court erred when after trial it increased the statutory maximum sentence under 18 U.S.C. § 1001 from five years to eight years, when the defendant was arraigned on a five year maximum sentence.**

A. Standard of Review.

This court reviews <u>de novo</u> constitutional due process claims. <u>United States v. Legree</u>, 205 F.3d 724, 729 (4th Cir. 2000).

B. Discussion of Issues

After the jury returned its verdict, the court noted that the defendant had been arraigned under the general provision of 18 U.S.C. §1001.   The court, <u>sua sponte</u>, reviewed the audio of the arraignment to confirm that the maximum penalty for Count Five stated by the government during the arraignment was five years.   J.A. 39.   The district court ordered briefing and concluded that <u>Apprendi</u> was inapplicable, that any error was harmless, and then directed the probation officer to calculate the guidelines based on the enhanced penalty paragraph under 18 USC 1001(3).   J.A.   919.

In sum, Legins was put on notice at his arraignment that the maximum

sentence to which he would be exposed on Count Five was five years.   The court

then increased that exposure, after trial, to eight years.   This increase violated

Legins' due process rights because 1) Mr. Legins was subject to more incarceration

than he was given notice of at arraignment; and 2) this rendered insufficient the

instructions given at trial because those instructions did not adequately define the

elements for the enhanced penalty.

On the date of Legins' arraignment, the government confirmed Count Five

to carry a maximum penalty of five years of imprisonment under the standard

provision of § 1001.   J.A. 919.   In fact, at no point before or during the trial was

there any request from the government to increase or revise the maximum penalty

to eight years.   This was not a mistake on the part of the government.   Legins

argues that it was the government's intent to only charge Count Five generally

under § 1001 because the government was confident in its ability to procure

convictions under Counts One through Four, which carried far greater potential

sentences and exposure to incarceration.

In support, it is noted that the Indictment did not charge Legins with any

particular subsecton of 1001.   J.A. 25 at 28.   Joint Jury Instruction 35 repeated the

language in the Indictment.   J.A. 747**.**   Joint Jury Instruction 36 defined the Count

Five offense as being under 1001(a)(2), but did not make reference to any

requirement that the false statement be made pursuant to matter involving crimes

under 109(A).   J.A. 748-749.   Joint Jury Instruction 37 did not include direction

that an additional fifth element be proven to establish that the matter involved a

crime under Chapter 109A.   J.A. 749.   Jury Instruction 38 did not contain the

definition of sexual act, nor did it refer to the definition of a sexual act in other

instructions.   J.A. 751-753.   The United States, in its closing, did not argue that

these offenses would be included within the scope of 109A.   J.A. 786-789.

There would have been no basis for timely objection by defense counsel to the

need for additional instruction to specifically address the defendant's exposure to

the enhancment,   because the enhanced penalty was not in play based on the terms

set forth at arraignment.    That being the case, the matter should be reviewed de

novo  versus for plain error.

    Even if the government argues that it intended, all along, to pursue Legins

under the enhanced penalty, under Apprendi, and its progeny, the government was

required to prove any fact that increased the range of penalty for a crime beyond

the regular prescribed statutor y maximum, beyond a reasonable doubt.   See

Apprendi v. New Jersey, 530 U.S. 466, 490 (2000).   Per Alleyne v. United States

any fact that increases the penalty for a crime is an element that must be submitted

to the jury and found beyond a reasonable doutbt.   Alleyne v. United States, 570

U.S. 99 (2013).   In this case, the regular maximum penalty under 18 U.S.C. §

21

1001 was five years.    In order to seek the enhanced penalty of eight years, the

government was required to specifically plead the necessary facts to establish that

the "matter" involved facts under 109A, or 109B or 110, or 117, or 1591, and the

jury was required to make a specific finding relating the matter to one of those

chapters.    Because 1) Count Five in the Indictment does not detail the enhanced

conduct with specificity, 2) there were no definitions provided in the Instructions

with regard to what offenses were sexual acts for purposes of Count Five, 3) the

enhancement language was not included as an element in the Instructions for

Count Five, 4) the verdict form just referenced "sexual act" without further

explanation, and 5) because the jury specifically acquitted Mr. Legins for any

alleged "sexual act" as defined in Counts One through Four, Legins argues that the

jury did not convict Legins under the enhanced sentence provision in § 1001, but

rather only the standard five year violation, and the conviction should be vacated

as violative of Appendi.

From a prejudice perspective, Mr. Legins was sentenced to less than five

years in prison.    That being the case, the government may argue that this was

harmless error.    Here, that was not the case.    Specifically, the court at sentencing

ruled that the offense level applicable after calculation of the guidelines was 18.

J.A. 966.    That level was based, in part, on a four level enhancement under

U.S.S.G. § 2J2.1(b)(1)(A) for a charge based on the eight year maximum versus

22

the five year maximum.   While the court ruled that an upward variance was

appropriate, the court started at a higher range than it should have, thereby causing

prejudice to Legins.

> **III.    The court erred in the sentencing of Mr. Legins, both procedurally
> and substantively.**

A. STANDARD OF REVIEW

In a sentencing challenge, the appellate court reviews a sentence for

reasonableness, applying a deferential abuse-of-discretion standard. The appellate

court first ensures that the sentence contains no significant procedural error, such

as miscalculating the sentencing guidelines range, inadequately considering the 18

U.S.C. § 3553(a) factors, or insufficiently explaining the sentence. If the appellate

court finds the sentence procedurally reasonable, the appellate court will consider

the substantive reasonableness of the sentence. This Court reviews the district

court's factual findings for clear error and its legal conclusions *de novo*.

B. DISCUSSION

The anchoring effect of the range on the ultimate sentence means that this

Court can rarely have faith that a guideline error did not "infect all that follows at

the sentencing proceeding."   See United States v. Diaz-Ibarra, 522 F.3d at 343 (4th

Cir. 2008).    The Supreme Court has relatively recently re-affirmed the

importance of selecting the right range.   Molina-Martinez v. United States, 136 S.

23

Ct. 1338, 1349 (2016). The Court noted that "[i]n the ordinary case the Guidelines

. . . serve as the starting point for the district court's decision and anchor the court's

discretion in selecting an appropriate sentence." For that reason, "in most cases the

Guidelines range will affect the sentence." Id.; See also Rosales-Mireles v. United

States, 138 S. Ct. 1897, 1907 (2018).

The sentence was procedurally unreasonable because (1) the court's

conclusions upon which the guidelines range were calculated were not supported

by the evidence, and the court improperly utilized factors to justify an upward

variance.

### A.    **Procedural Defect with Preponderance Findings**.

The district court erred, based on the jury's verdict, in finding that the

government established, by a preponderance, that Legins 1) engaged in the

uncharged illegal contact under 18 U.S.C. § 2244 on March 16, 2018, and 2) the

committed the acquitted conduct on May 10, 2018.

### 1.  **March 16, 2018**

For sentencing purposes, the court found by a preponderance of the evidence

that the victim, instead of being sexually abused by the defendant, actually

masturbated the defendant on March 16, 2018.   The court found that conduct,

which was not charged, to be in violation of 18 U.S.C. § 2244.   J.A. 921.   The

court relied on two items of evidence to support its finding, the testimony of B.L.,

24

and the DNA recovered from the sweatshirt.   J.A. 922.   This finding was error because, consistent with the jury's determination on B.L."s credibility, there was no substantial credible evidence to support the court's conclusion, even by a preponderance.    Second, while the court characterized the DNA finding on the sweatshirt as "sperm", the government's expert conceded that the DNA found on the sweatshirt could not be conclusively found to be sperm.   J.A. 922; J.A.114. Moreover, the manner, time, method, or basis for Legins' DNA to be on the B.L.'s sweatshirt was totally within the control of B.L.   The mere presence of Legins' unclassified DNA on B.L.'s sweatshirt did not support any form of penetration, or contact.    In sum, because B.L's testimony should have been disregarded, and because the sweatshirt added no proof that the events on March 16, 2018 transpired as relayed by B. L., there was no evidence to support even a preponderance finding that Legins' statements were false with respect to the March 16, 2018 incident.

### 2.  May 10, 2018

The court then concluded, with respect to the May 10, 2018 incident, that Legins "had sex in Mr. Lemagne's rectal area".   J. A.   922. The court used, as corroboration, 1) B.L's testimony, 2) the anorectal swabs, and 3) the prison tapes reflecting entry and exit into the corridor. J.A. 922.   As with the finding on the March 16th incident, based on the jury's verdict, there was not substantial credible evidence to determine, even by a preponderance, that Legins penetrated B.L.'s

anus with his penis as required by the statute.  The prison tapes only reflect an

entry into the corridor and an exit from the corridor with a total elapsed time of

315 seconds.  The only person that could have testified to what happened in those

315 seconds was B.L.  The fact that B.L. alleged all of this violent conduct, which

included one incident of oral sex, then relocation, then another five minutes of

being raped,  to have happened within 315 seconds, when defense counsel's

investigator testified that the time, simply to walk from place to place within the

corridor, took 70 of those 315 seconds, actually further undermined the credibility

of B.L.  Remember that B.L.'s "prompt" affidavit, under penalty of perjury,

established the rape time as being five minutes alone.  J.A. 817.10.

The only independent evidence upon which the preponderance finding could

have been based was the DNA found on B.L's rectum.  The court improperly

concluded that the mere presence on the <u>outside</u> of B.L's rectum positively

established the Legins' penis penetrated the <u>inside</u> B.L., even if slightly.  Other

than B.L.'s incredible testimony, there was no evidence to support a finding that

Legins' penis ever made contact with B.L's rectum.  In fact, the evidence was

directly to the contrary.  Both the government's expert and the defense expert

witnesses concluded that there was no evidence of damage to B.L's anus.  The

examiner used dye and a specific procedure to detect possible damage, even to a

single cell of tissue, under a microscope.  No damage was detected.  The

examination revealed that B.L.s' anus was tight.    The parties stipulated that
Legins had a seven-inch penis at erection.    No internal tests were taken.    The only
lubricant, according to B.L., was spit which had no innate lubricating quality.    J.A
64.    The lack of evidence of any damage, even the slightest, precluded any finding
of actual penetration which the court was required to find to establish a
preponderance.    In fact, the defense's expert opined that, based on all of the
foregoing factors, she would have expected to see damage.

Additionally, a fact which the court did not address, but was significant, was
that B.L. had toilet paper around the circumference of his rectum at the time of
examination.    J.A.    70.    This was never explained by the government.    Legins'
expert opined that it would have unusual to find toilet paper in that location if the
victim had just been forcibly raped by a man for five minutes with a seven-inch
penis.    J.A. 712.    In sum, while there was evidence that Legins' DNA made it
somehow, in some way, to B.L's rectum area, there was no credible evidence to
support how that DNA got there, or the conclusion by the court that B.L's anus
was penetrated, even slightly.    Accordingly, it was error for the court to find, even
by a preponderance, that Legins sexually abused B.L. by penetrating his anus on
May 10, 2018.

Notwithstanding, based on the court's preponderance findings, the court
instructed the probation officer to calculate the sentencing range based on the

27

acquitted conduct under Count Three. The court then ordered the probation officer to group the uncharged conduct (abusive contact) as if it had been charged and proven.   After the grouping, the probation officer determined that the computation strictly under U.S.S.G § 2J1.2 yielded an offense level of 18 (14+4), which was greater than the result under the cross reference.   Accordingly, the court used § 2J1.2 as the guideline range applicable to Mr. Legins.   That range was 27 to 33 months.   Because the grouping did not result in higher range than the base range, the court then added the range for that uncharged conduct (15 to 21 months), as if the government had independently charged and proven a sexual "contact" charge under 18 U.S.C. § 2244.

The court then arbitrarily assigned five levels based on the March16, 2018 uncharged conduct based on its conclusion that five levels was the "value" of having an inmate masturbate an officer in a consensual setting.   J.A. 995.   This guideline calculation method was also procedurally incorrect and resulted in higher adjusted guideline range..   The court essentially created a different fact pattern regarding consensual masturbation by the victim of the defendant, when even the victim did not testify to that event.

### 3.   Procedural Error with Other Acts

The court then concluded that based on the "nature and circumstances of Defendant's extensive obstruction, pre-meditation, and past similar conduct," that

adjusted range of 42-54 months better reflected the seriousness of the offense and related conduct.   J.A. 1015-1022.   The court relied upon the additional factors set forth in his memorandum to be addressed infra to sentence Mr. Legins.   J.A. 1035.

The court's perspective for purposes of sentencing was that Legins committed every offense, as alleged, and that all of the supporting evidence introduced by the government could be taken into consideration as proof that Legins committed the offenses.   See J.A. 13.   While that may have been the court's opinion, the defendant deserved a fair sentence based on the inevitable conclusions that have to be drawn from the jury's verdict.

That being the case, for example, the fact that Legins called Nurse Ramsey, or other guards, or anyone, after the May 10, 2018 incident to inquire about B.L.'s whereabouts, or what was being alleged by B.L., would not have been obstructive conduct, because the jury did not conclude that the underlying conduct occurred.

By way of further example, if the jury believed that B.L. had falsely accused Legins' of sexual abuse during his initial contacts with staff, which they obviously did to some degree, the conduct, e.g., suspicious phone calls, which the court found as aggravating for sentencing, even if true, would not have been seen by the jury as obstructive.   The jury would have determined that Legins calls was acts of self-preservation, whether to save his job, or try to determine the nature of B.L.'s false accusations.

A sentencing court must impose a sentence within the properly calculated

range unless there is an aggravating circumstance not taken into consideration by

the guidelines.   United States v. Barber, 119 F.3d 276 (4ᵗʰ Cir. 1997).   The court

must decide whether the circumstance is encouraged or discouraged.   Id.   If

discouraged because the conduct is already accounted for in the guidelines, the

conduct must have been present to an uncommon degree.   Id.

In turning to guidelines, while the commentary in 2J1.2 does allow for an

upward departure for a particularly serious sex offense, this crime was not a

particularly serious sex offense because the cross reference did not yield a higher

range in accordance with the policy statement.   U.S.S.G 2J1.2, Application Note

4; U.S.S.G. 2J1.2, Background.

The Background policy to 2J1.2 reads:

> This section addresses offenses involving the obstruction of
> justice generally prosecuted under the above-referenced statutory
> provisions. Numerous offenses of varying seriousness may constitute
> obstruction of justice: using threats or force to intimidate or influence
> a juror or federal officer; obstructing a civil or administrative
> proceeding; stealing or altering court records; unlawfully intercepting
> grand jury deliberations; obstructing a criminal investigation;
> obstructing a state or local investigation of illegal gambling; using
> intimidation or force to influence testimony, alter evidence, evade
> legal process, or obstruct the communication of a judge or law
> enforcement officer; or causing a witness bodily injury or property
> damage in retaliation for providing testimony, information or
> evidence in a federal proceeding. The conduct that gives rise to the
> violation may, therefore, range from a mere threat to an act of
> extreme violence.

30

> Because the conduct covered by this guideline is frequently part of an effort to avoid punishment for an offense that the defendant has committed or to assist another person to escape punishment for an offense, a cross reference to §2X3.1 (Accessory After the Fact) is provided. Use of this cross reference will provide an enhanced offense level when the obstruction is in respect to a particularly serious offense, whether such offense was committed by the defendant or another person. (emphasis added)

In looking at Chapter 5K, there is only one basis which could possibly be utilized as a basis for departure.   U.S.S.G 5K2.7, states:

> If the defendant's conduct resulted in a significant disruption of a governmental function, the court may increase the sentence above the authorized guideline range to reflect the nature and extent of the disruption and the importance of the governmental function affected. Departure from the guidelines ordinarily would not be justified when the offense of conviction is an offense such as bribery or obstruction of justice; in such cases interference with a governmental function is inherent in the offense, and unless the circumstances are unusual the guidelines will reflect the appropriate punishment for such interference.   U.S.S.G 5K2.7. (emphasis added).

In this case, the cross reference computation yielded a lower offense level than standard range.   According to the policy statement, the guidelines did not envision the offense as a particularly serious offense because the cross reference was unnecessary.   The Probation Officer did not determine the obstruction to be "substantial interference" under 2J1.2(2).   Lastly, 5K2.7 provided that departures based on obstruction were not justified unless the circumstances are unusual.

Based on the Memorandum Opinion, specific additional conduct relied upon

31

to grant an upward departure was as follows (J.A. 1053):

i.    Testimony from Nurse Ramsey

   1.  That when B.L. arrived at the prison's medical facility for an
       examination following the May 10, 2018 offense, Legins called her to
       ask for medicine.   He had never called her before.   J.A. 1054.

Although, perhaps atypical, there is no evidence to suggest that Legins, in any

way, attempted to coerce, threaten, or obstruct Nurse Ramsey's efforts.   Based on

the jury's findings, Legins was simply looking for information about what was

being relayed by B.L. to staff.   At worst, it should have been a neutral factor.

ii.   Officer McLaughlin testified that on the night of the May 10, 2018
      offense, he heard someone who sounded like Legins shout "you got to be
      kidding me" as he escorted B.L. across the prison complex to the
      Lieutenant's office.   J.A. 1024.

The court treated this as aggravating obstructive conduct, even though

McLaughlin testified that he did not see Legins make the statement and was not

100% sure it was Legins at all. J.A. 467; J.A. 469.   From, the jury's perspective,

even if true, this would have been legitimate expression of disbelief on the part of

Legins who would have assumed that B.L. was being escorted to report conduct

which Legins anticipated to be false.   Based on the jury's findings, this should not

have been considered as "obstructive conduct" justifying an upward variance.

iii.  Legins called Officer McLaughlin in the Lieutenant's office twice for
      "suspicious reasons".   J.A. 1054.

This should have been a neutral factor based on reasons stated above.

iv.  Legins provided an explanation on June 5, 2018, attempting to explain away the presence of biological evidence on B.L.'s clothing.   J.A. 1054

This version and, frankly, all of Legins' versions, have to be placed in context after reviewing the jury's conclusions.    Specifically, there was no evidence to suggest that Legins had any insight into the government's investigation.    If B.L. had fabricated all, or even a portion, of events, Legins would not have known what would have been alleged by B.L.   Legins went into this June 5, 2018 interview voluntarily, but was then confronted with allegations of sexual abuse, sexual activity, and rape.    These statements would not have come from Legins based on his premeditation. These statements arguably came from Legins who was surprised.   Because the jury concluded that B.L.'s version was, at least in part, false, it was not fair or reasonable to increase Legins' sentence based on his illogical statements, when the statements were made to defend himself from false allegations.   At worst, his statement should have been a neutral factor for sentencing.

v.  Legins stated that he and another colleague, Officer Harry Parker, had seen B.L. cleaning the bathroom while unattended.  J.A. 1055.

This should have been a neutral factor based on the foregoing reasons.

vi.  Legins used the "premeditation" through the use of grooming.   J.A. 1055.

There was no evidence to establish these items of grooming other than the

testimony of B.L. which was rejected by the jury. Accordingly, this basis for

upward departure did not honor the jury's findings.

> vii.  Legins planned on how he would avoid detection during both offenses by escorting B.L. into an unattended hallway, where he knew there would be no surveillance camera. J.A. 1056.

Again, that evidence, to be used as a basis for upward departure, is based purely

on the court's substitution of its belief in place of the jury's finding. It was not

uncommon for Legins, or any officer, to escort B.L. through the corridor. J.A.

221-223. The jury concluded that the acts as alleged in the office or hallway were

not proven. If the jury concluded that it did not happen as alleged, the fact that

Legins escorted B.L. through the corridor, as typical, should not have served as a

basis for upward departure.

> viii.  In 2008, while Legins was employed by the Richmond Sheriff's Office a female inmate accused him of asking her to "show him something".

In 2008, Legins was reprimanded for unbecoming conduct while working as a

guard for the City of Richmond Sheriff's office., suspended from work for five (5)

days and was allowed to return to work. Nothing more. The event was **ten** (10)

years prior to the date of the alleged offenses and was not a criminal offense. It

should not have been considered under U.S.S.G. § 5H1.5 and would not even be

counted for criminal history, yet it was a basis for upward departure.

In sum, none of the factors took the sentencing event to a non-heartland range.

34

To the contrary, the court utilized discouraged factors that were not to a "uncommon degree" that they warranted inclusion in a five level upward departure. It was therefore procedural error to utilize these factors as a basis for an upward departure when they were not based on the nature of the convicted conduct under 1001, but on the nature of the <u>acquitted</u> conduct under Counts One through Four.

## B. <u>Substantive error</u>.

In sum, once the jury acquits, the Sixth Amendment does not license the Government to punish a defendant as if a guilty verdict had been returned on a particular charge. "The jury could not function as the circuit breaker in the State's machinery of justice if it were relegated to making a determination that the defendant at some point did something wrong, a mere preliminary to a judicial inquisition into the facts of the crime the State actually seeks to punish." <u>Blakely v. Washington</u>, 542 U.S. 296, 303 (2004).

The use of acquitted crimes to calculate an initial guideline range deprives a defendant of his Sixth Amendment right to a sentence wholly authorized by the jury's verdict. <u>See Cunningham v. California</u>, 549 U.S. 270, 290 (2007) ("If the jury's verdict alone does not authorize the sentence . . . the Sixth Amendment requirement is not satisfied.").

In this case, the Court will have to determine which set of facts were authorized by the jury's verdict after taking in the whole of the evidence. One

hypothetical is that the jury believed Legins was lying about some type of
unidentified sexual <u>contact</u> which did not involve penetration, which was
consensual in nature, which was not covered by any definition under Counts One
through Four, that Legins was embarrassed by it, and therefore lied about it.   If
this case, the jury convicted the defendant of a crime for which he was not even
charged.   Regardless, from a sentencing perspective, and if that was the jury's
logic, the only theoretical sentence authorized by that fact pattern would be the
range under §2A3.4 for lying about sexual contact with an inmate which would
have been an offense level of 14 with guideline range of 15 to 21 months.   To go
one step further, if in fact this court determines that jury made that, or a similar
conclusion, the only conduct for sentencing purposes would have been lying about
unauthorized consensual contact, which was consensual in nature, and which
caused no physical injury to the victim.   All of the other aggravating factors would
be immaterial.     Even if <u>both</u> incidents were properly utilized by the sentencing
court, the sentencing event should have been based on contact only, by consent,
without penetration, and with no evidence of physical injury to the victim.   These
findings would have been more supportive of a downward variance versus an
upward variance.   The jury did not authorize a sentence on a sexual act.

   The Sentencing Position of Legins, which is incorporated herein described
the 3553(a) factors relevant to Legins' past. J.A. 873.   The defendant's position

36

with respect to the variance, which is also incorporated herein by reference, was filed and mostly rejected or disregarded.   J.A. 957.   Legins had no criminal record.   Tremendous community support.   In sum, the sentencing court substantively sentenced the defendant to a period of incarceration that was greater than necessary to address the conduct upon which the jury convicted the defendant, whatever that conduct was.   The court, in doing so, punished the defendant for conduct which the jury did not authorize thereby committing error.

## CONCLUSION

This case is unique in that the jury acquitted the defendant of the exact same conduct on which the jury acquitted the defendant.   Whether the jury simply wanted to convict Legins of something, or whether they were confused, or whether they compromised, the government was still required to prove beyond a reasonable doubt the sexual act of penetration of Legins penis to B.L.'s mouth or anus to establish the falsity of Legins statements.   It did not as a matter of law.

If the court disagrees with Legins, the anchor sentencing range was established incorrectly thereby infecting the balance of the sentencing event.

If the court again disagrees with Legins, then the evidence did not establish conduct that would remove the initial range from the heartland by five additional levels, and particularly when the five levels were based on unmentioned or discouraged factors.

37

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

The defendant does not request oral argument.

CHIKOSI LEGINS

By_____/s/_____
Of Counsel

Charles A. Gavin, Esquire, VSB#31391
Cawthorn, Deskevich & Gavin, P.C.
Counsel for Chikosi Legins
1409 Eastridge Road
Richmond, VA   23229
Telephone:   (804) 288-7999
Telecopier:   (804) 288-9015
c.gavin@cawthorn.net

## <u>CERTIFICATE OF COMPLIANCE</u>

1. This brief has been prepared using Word, Times New Roman, 14 point.

2. EXCLUSIVE of the corporate disclosure statement; table of contents; table of citations; statement with respect to oral argument; any addendum containing status, rules, or regulations; and the certificate of service, this Brief of Appellant contains 40 pages with 9,082 words.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions. If the Court so directs, I will provide an electronic version of the brief and/or a copy of the word or line printout.



_____/s/_____
Charles A. Gavin

Charles A. Gavin, Esquire, VSB#31391
Cawthorn, Deskevich & Gavin, P.C.
1409 Eastridge Road
Richmond, VA   23229
Telephone:   (804) 288-7999
Telecopier:   (804) 288-9015
Counsel for Chikosi Legins
c.gavin@cawthorn.net

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on December 1st, 2020, I electronically filed the foregoing

Opening Brief of Appellant with the Clerk of Court for the United States Court of

Appeals for the Fourth Circuit by using the CM/ECF system. The participants in

the case are registered CM/ECF users and service will be accomplished by the

appellate CM/ECF system.

I further certify, that on December 1st, 2020, I served the Joint Appendix

Sealed Volume III, via USPS, on counsel listed below:


     Tovah R. Calderon
     Christopher C. Wang
     U. S. DEPARTMENT OF JUSTICE
     Civil Rights Division - Appellate Section
     P. O. Box 14403
     Ben Franklin Station
     Washington, DC 20044


                         _____/s/_____
                         Charles A. Gavin

Charles A. Gavin, Esquire, VSB#31391
Cawthorn, Deskevich & Gavin, P.C.
1409 Eastridge Road
Richmond, VA   23229
Telephone:   (804) 288-7999
Telecopier:   (804) 288-9015
Counsel for Chikosi Legins
c.gavin@cawthorn.net